## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Ruby Pipeline, L.L.C.,[1] | Case No. 22-10278 (CTG) |
| Debtor. | |

## DECLARATION OF WILL W. BROWN IN SUPPORT OF
## DEBTOR'S PETITION AND REQUESTS FOR FIRST DAY RELIEF

I, Will W. Brown, declare pursuant to 28 U.S.C. § 1746 as follows:

1.       I am the Vice President, Commercial for the Kinder Morgan Natural Gas Pipelines West Region, a division of Kinder Morgan, Inc. ("**KMI**"), and an officer at Ruby Pipeline, L.L.C. (the "**Company**" or the "**Debtor**"), a natural gas pipeline company located in the western United States with respect to which KMI owns an indirect equity interest and of which a wholly owned subsidiary of KMI serves as operator.  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

2.       I am over the age of 18 and authorized to submit this declaration on behalf of the Debtor.  If called as a witness, I would testify competently to the facts set forth in this First Day Declaration.

3.       This First Day Declaration is divided into five parts.  Part I provides background information about myself.  Part II is an introduction regarding the Chapter 11 Case.  Part III provides background information about the Debtor, its business operations, and its corporate and

---

[1]       The last four digits of the Debtor's tax identification number are 2249.  The main address of the Debtor is 1001 Louisiana Street, Houston, Texas 77002.

capital structures. Part IV describes the circumstances leading to the commencement of this Chapter 11 Case. And Part V affirms the facts that support the "first-day" relief requested in the various motions and an application filed contemporaneously herewith (the "**First Day Motions**").

## I. Background of Declarant

4.     In my role as Vice President, Commercial, among other things, I oversee the commercial management activities, including marketing, optimization, account services and financial planning for approximately ten natural gas companies located in the western United States in which KMI has an ownership interest, including the Debtor.

5.     I hold a Bachelor of Science in Mechanical Engineering from the University of Colorado, Boulder and an MBA in Finance from the University of Colorado, Colorado Springs. I have more than 30 years of experience in the oil and gas industry. Prior to joining KMI, I worked for major oil and gas producers in my capacity as an engineer for more than a decade and am a registered Professional Engineer (inactive) in the State of Texas. Since 2004, I have continued to work in the oil and gas industry in commercial, business development and as an executive officer.

6.     As a result of my role and experience with the Debtor, my review of relevant documents, and my discussions with members of the Debtor's management team, I am familiar with the Debtor's day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein. Except as otherwise stated, all facts set forth in this First Day Declaration are based on my personal knowledge, my discussions with members of the Debtor's senior management and advisors, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtor's operations and financial condition. In making this First Day Declaration, I have relied in part on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified, and provided

2

to me, in each case, under my supervision, at my direction, and for my use in preparing this First Day Declaration.

## II.    Introduction[2]

7.      The Debtor owns and facilitates the operation of a 42-inch diameter, 683-mile-long natural gas pipeline (the "**Ruby Pipeline**") originating at the Opal Hub in Opal, Wyoming and terminating at the Malin Hub in Malin, Oregon, near the California border.[3]   The Debtor is a midstream service provider and acts as a transporter of natural gas from the Rocky Mountain basins to the Pacific Northwest.   The Debtor generates revenues from the transportation services of natural gas through the Ruby Pipeline and ancillary sales of natural gas.   The Debtor has been profitable as the result of favorable long-term Firm Contracts whereby third-party shippers of natural gas reserve capacity to transport natural gas on the Ruby Pipeline in exchange for a fixed fee, regardless of whether the reserved capacity is used, and a variable fee for amounts actually transported through the Ruby Pipeline.

8.      At the time of construction of the Ruby Pipeline, the Debtor entered into long-term Firm Contracts with 12 shippers for 1.103 million Dths/d[4] of pipeline capacity at favorable rates. The majority of these Firm Contracts were for a term of ten years and expired in July 2021.   While the Debtor has attempted to re-contract with parties to expired Firm Contracts or enter into new Firm Contracts with replacement shippers, as a result of market dynamics described below, the Debtor has generally been unable to renew or replace the Firm Contracts with long-term Firm

---

[2]      Capitalized terms used in this Part II Introduction that are not otherwise defined herein shall have the same meanings ascribed to such terms in the body of the First Day Declaration.

[3]      A map reflecting the location of the Ruby Pipeline is located at paragraph 19, *infra*.

[4]      "Dths/d" is an industry terms that means dekatherms per day.  A dekatherm is equivalent to 1,000,000 British Thermal Units, which is the amount of heat required to raise one pound of water by one degree Fahrenheit.

Contracts, reducing contracted capacity by approximately 700,000 Dths/d. Instead, the Debtor has only been able enter into short-term contracts at rates well below those of the initial anchor shipper contracts and at lower volumes, with approximately 604,000 Dths/d under contract as of March 2022 (approximately 40% of the Ruby Pipeline's daily maximum capacity).

9. Over the past decade, natural gas supplies have increased in North America, which has generally resulted in lower natural gas prices. This, coupled with certain other challenging macroeconomic fundamentals, has resulted in decreased profitability in the Rocky Mountain basins and extraction from such basins trails other basins in North America. Consequently, there is less demand for natural gas from the Rocky Mountain basins and less natural gas has been transported through western natural gas pipelines, including the Ruby Pipeline, during the past decade. The result of the foregoing factors has created a challenging re-contracting environment for the Debtor as shippers generally need to transport less natural gas from the Rocky Mountain basins.

10. Despite market headwinds in recent years, the Debtor has been able to stave off financial distress and remain profitable through its Firm Contracts, which function as take or pay contracts and have historically accounted for approximately 84% of the Ruby Pipeline's maximum capacity. Thus, the lack of used capacity in the Ruby Pipeline has, in the past, not adversely affected the Debtor's revenue stream. As a result, the Debtor has historically and timely serviced its current debt obligations, all of which are unsecured. The balance of the Debtor's 2022 Unsecured Notes matures on April 1, 2022 in the principal amount of $475 million. Although the Debtor has sufficient liquidity to operate its business and its balance sheet is otherwise strong, the Debtor lacks sufficient liquidity to satisfy its obligations under the 2022 Unsecured Notes on the maturity date of April 1, 2022.

4

11.     In light of the anticipated expiration of the majority of the Debtor's long-term Firm Contracts, in February 2020, Standard & Poor's ("**S&P**") downgraded the Debtor's 2022 Unsecured Notes and then downgraded them again in April 2020.  In February 2021, S&P further downgraded the 2022 Unsecured Notes.  About that same time, an ad hoc group of the Debtor's 2022 Unsecured Noteholders (the "**Ad Hoc Group**") retained advisors and commenced negotiations with KMI and Pembina (as defined below), the Debtor's sponsors, regarding the 2022 Unsecured Notes.  In November 2021, S&P downgraded the Debtor's 2022 Unsecured Notes again citing near-term default risk.

12.     In March 2022, the Debtor constituted a special committee of independent directors (the "**Special Committee**") to explore restructuring options for the Debtor, including a potential chapter 11 filing.  After evaluating the Debtor's liquidity position, maturing debt obligations, current and expiring Firm Contracts, and the lack of a resolution with the Ad Hoc Group, the Special Committee recommended to the Debtor's Board of Managers that the Debtor file for protection under chapter 11 of the Bankruptcy Code to explore all possible restructuring alternatives, including, among other options, a sale of substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code and/or a chapter 11 plan, or reorganization pursuant to a chapter 11 plan.

13.     Accordingly, on March 31, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**") under chapter 11 of the Bankruptcy Code, thereby commencing this Chapter 11 Case.  To ease its transition as debtor in possession, the Debtor subsequently filed the First Day Motions.  I submit this declaration to: (i) offer the Court and parties in interest a background on the Debtor and the

circumstances leading to the commencement of its Chapter 11 Case; and (ii) provide evidence for the relief requested in the First Day Motions.

## III. Discussion

### A. History

14.     In 2007, El Paso Corporation ("**El Paso**"), at the time one of the largest natural gas pipeline companies in the United States, announced its intention to construct the Ruby Pipeline to facilitate the transportation of natural gas from the Rocky Mountain basins to the Pacific Northwest.  At that time, the Rocky Mountain basins constituted the second largest natural gas resource and the largest natural gas producing region in the United States according to the U.S. Energy Information Administration.  While the region had been known for decades to have tremendous volumes of natural gas in place, the Rocky Mountain basins went largely undeveloped because of low wellhead prices, lack of accessibility and a shortage of adequate takeaway capacity. However, in the second half of the 2000s, market dynamics in the western United States became more favorable as the supply of Canadian natural gas into the western United States decreased and takeaway capacity from the Rocky Mountain basins increased, resulting in increased development of tight natural gas formations in the Rocky Mountain basins and making the Ruby Pipeline a viable economic opportunity.  In addition, construction of the Ruby Pipeline would bring resource diversification to Northern California and the Pacific Northwest and was in the public interest.

15.     In November 2007, El Paso formed the Company to facilitate the development and construction of the Ruby Pipeline.  The Company's anchor shipper, and initial investing partner in the Ruby Pipeline, was Pacific Gas & Electric Company ("**PG&E**").  In 2011, PG&E entered into a Firm Contract for 25% of the Ruby Pipeline's maximum capacity.

6

16.     In 2009, citing increasing costs to develop the Ruby Pipeline, PG&E pulled its investment out of the Ruby Pipeline but nonetheless remained its anchor shipper. Also in 2009, El Paso solicited and received a $700 million preferred equity investment from Global Infrastructure Partners ("**GIP**") providing GIP with 50% ownership of the Company.

17.     On May 3, 2010, the Company entered into a senior secured credit facility (the "**2010 Secured Credit Facility**"), with a syndicate of lenders, providing for construction financing in the maximum amount of $1.5 billion.

18.     In 2010, the Federal Energy Regulatory Commission ("**FERC**"),[5] the main governmental entity with regulatory authority over the Ruby Pipeline, and other governmental agencies approved the Ruby Pipeline, and the Company began construction soon thereafter. Construction of the Ruby Pipeline commenced in 2010, and the Ruby Pipeline was completed and commenced service in July 2011. The total construction costs for the Ruby Pipeline were approximately $3.7 billion, which was paid from the proceeds of the 2010 Secured Credit Facility and El Paso's and GIP's combined equity investment of $2 billion.

19.     The Ruby Pipeline has a takeaway capacity of 1.5 bcf/d,[6] and includes four compressor stations, Roberson Creek, Wildcat Hills, Wieland Flat and Desert Valley (the "**Compressor Stations**" and, together with Ruby Pipeline, collectively, the "**Facilities**"), with a combined 157,000 horsepower of compression to facilitate the westward transportation of natural

---

[5]     FERC is the federal agency charged with specific regulatory oversight over the interstate transportation of energy (*i.e.*, natural gas, oil, refined petroleum products, and electricity), wholesale power transactions, and the authorization of certain energy infrastructure, including liquefied natural gas (LNG) terminals, interstate natural gas pipelines, and hydropower projects. Pursuant to the Natural Gas Act (15 U.S.C. § 717 *et seq*) and its accompanying regulations (CFR Title 18, Chapter 1, Subchapter E), all services and related rates for interstate oil and gas transportation service are filed with and approved by FERC in a pipeline's tariff (a "**Tariff**"). The Company's Tariff was approved in connection with FERC's approval of the Ruby Pipeline in 2010.

[6]     "bcf/d" is an industry terms that means billion cubic feet per day.

gas from Opal to Malin.  A map setting forth the location of the Ruby Pipeline and the Compressor Stations is set forth below:[7]



20.    Upon the completion of the Ruby Pipeline, the Company gained access to all the major producing basins in the Rocky Mountains as the natural gas infrastructure therein gathers all natural gas to one of two hubs, the Opal Hub, which the Ruby Pipeline is connected to, and the Cheyenne Hub (not pictured), located roughly 300 miles to the east of the Opal Hub.[8] These hubs are then linked by several pipelines including the Colorado Interstate Gas pipeline and the Wyoming Interstate Company pipeline (vis a vis capacity on Overthrust Pipeline), which are owned by wholly owned KMI affiliates of the Debtor.

---

[7]    KMI and/or its affiliates, through KMI's acquisition of El Paso, which is discussed at paragraph 21, *infra*, now controls the El Paso pipelines reflected in the map.

[8]    Major natural gas basins in the Rocky Mountains include, among others, Greater Green River, Uinta, Piceance, Powder River, Big Horn, Wind River, Central Overthrust, Paradox, San Juan, Denver-Julesberg, and Raton basins.

8

21.     In 2012, KMI acquired El Paso and its equity interest in the Company.  In 2014, Veresen Inc. ("**Veresen**") acquired from GIP its preferred equity interest in the Company.  In 2017, Pembina Pipeline Corporation ("**Pembina**") acquired Veresen and its preferred equity interest in the Company.  As of the date hereof, KMI and Pembina are the co-sponsors of the Company.

### B.  Business Overview

22.     The oil and gas industry are typically divided into three major sectors: "upstream," "midstream," and "downstream." The upstream sector is comprised of "exploration and production" companies that focus on locating and extracting crude oil, raw natural gas, and other hydrocarbons from the ground.[9]  The downstream sector is comprised of the companies that carry out the marketing and distribution of the products derived from the extracted hydrocarbons to the ultimate end users.[10] The Debtor operates in the space between—the midstream sector.

23.     The midstream sector is the link between the exploration and production of natural gas and the delivery thereof to its end-users.  The midstream sector itself can be thought of in several subcomponents: (i) *gathering*, where a system of smaller diameter, lower pressure pipelines are connected to producers' wellheads to transport unprocessed, raw natural gas to a centralized location for initial processing;  (ii) *processing*, whereby the natural gas is processed such that it can be further transported in the pipeline system without damaging the pipeline infrastructure; (iii) *transportation*, where wide-diameter, higher pressure, long distance pipelines move processed natural gas from producing areas to market areas, sometimes over considerable distances; and (iv) *storage*, where processed natural gas is stored underground for future

---

[9]     Upstream providers that have recently filed for chapter 11 protection include: *In re Ursa Piceance Holdings LLC, et. al.*, Case No. 20-12065 (BLS) (Bankr. D. Del. Sept. 2, 2020).

[10]    Downstream providers that have recently filed for chapter 11 protection include: *In re PES Holdings, LLC, et. al.*, Case No. 19-11626 (KG) (Bankr. D. Del. July 22, 2019).

processing and consumption. The Debtor participates in the midstream sector as a transporter of processed natural gas in the western United States via the Ruby Pipeline.

24. As a transporter, the Debtor generates revenues by transporting natural gas through the Ruby Pipeline. To do this, the Debtor principally sells the capacity of the Ruby Pipeline in advance of transportation, subject to the rates set forth in its FERC-approved Tariff. Typically, the Debtor enters into either (i) firm commitment contracts (the "**Firm Contracts**") where the shipping party pays (a) a fee to reserve a portion of the Ruby Pipeline's daily capacity and (b) a variable fee for natural gas transported through the Ruby Pipeline or (ii) interruptible contracts ("**Interruptible Contracts**") where the shipping party does not reserve capacity, may only use the Ruby Pipeline if capacity is available and, to the extent capacity is available and the shipper transports natural gas through the Ruby Pipeline, the shipper pays a variable fee. Historically, the vast majority of the Company's revenues have been generated under Firm Contracts.

25. At the time of the Ruby Pipeline's completion in 2011, the Debtor had long-term Firm Contracts through July 2021 with 12 shippers accounting for 71% of the Ruby Pipeline's capacity. As of the Petition Date, though, Firm Contracts now account for approximately 25% of the Ruby Pipeline's maximum capacity as certain of those contracts have rolled off (*i.e.*, expired).

**C. Corporate Structure**

26. The Debtor is a Delaware limited liability company that is wholly owned by non-debtor Ruby Investment Company, L.L.C. ("**Ruby Investment**"), a Delaware limited lability company, which is in turn wholly owned by Ruby Pipeline Holding Company, L.L.C. ("**Ruby Holding**"), a Delaware limited liability company. The ultimate parent entities of the Debtor are (i) KMI, which acquired its equity interest in the Debtor through its acquisition of El Paso in 2012, and (ii) Pembina, which acquired its preferred equity interest in the Debtor through its acquisition

10

of Veresen in 2017. Pembina holds its preferred equity interest in the Debtor indirectly through Ruby Holding's Class A Preferred Units, and KMI holds its equity interest indirectly through EP Ruby LLC, a Delaware limited liability company ("**EP Ruby**"), which holds Ruby Holding's Class B Common Units. As discussed below, EP Ruby is the Operator and Construction Manager (each as defined below) for the Facilities. A chart depicting the Debtor's corporate structure is attached hereto as **Exhibit A**.

27.     As set forth in the *First Amended and Restated Limited Liability Agreement of Ruby Pipeline Holding Company, L.L.C.* (as amended from time to time, the "**Ruby Holding LLCA**"), EP Ruby serves as the managing member of Ruby Holding to manage and control the business, affairs and properties of Ruby Holding, Ruby Investment, and the Debtor. Certain matters, though, require the approval of Ruby Holding's management committee (the "**Management Committee**"), as more fully set forth in the Ruby Holding LLCA. The Management Committee is comprised of one representative from each of KMI, the common member, and Pembina, the preferred member, the only two members holdings interests in Ruby Holding. Among other items requiring approval of the Management Committee, the Management Committee has approval rights over the Operating Period Budget under the O&M Agreement (each as defined below).

### D.  Agreements with Affiliates

#### i.  Operation and Maintenance Agreement

28.     The Debtor does not have any employees. Instead, the Debtor contracts with EP Ruby to operate, manage and maintain the Facilities. In connection with the construction of the Facilities and its operation, CIG Pipeline Services Company, L.L.C. ("**CIG Services**"), as the Operator thereunder, and the Debtor entered into that certain *Operation and Maintenance Agreement*, dated August 13, 2009 (as amended, the "**O&M Agreement**").

29.     On May 30, 2014, EP Ruby and El Paso Pipeline Partners Operating Company,

L.L.C. ("**El Paso Pipeline Partners**") entered into that certain *Assignment and Assumption*

*Agreement* whereby El Paso Pipeline Partners, after having taken assignment of CIG Services'

rights, duties and obligations under the O&M Agreement on May 2, 2014, assigned to EP Ruby

all of its rights, duties and obligations under the O&M Agreement. [11]

30.     Pursuant to the O&M Agreement, EP Ruby through its affiliates employs the

individuals who operate, manage and maintain the Facilities for the benefit of the Debtor.  Under

the O&M Agreement, among other things, EP Ruby provides for (i) the physical operation and

maintenance of the Facilities, (ii) the management of the day-to-day commercial, administrative

and regulatory functions of the Debtor and the business development functions of the Debtor, (iii)

the management, administration and oversight of any contractors, vendors, consultants, service or

other organizations, if any, retained by the Debtor (or by EP Ruby on behalf of the Debtor), and

(iv) those other services set forth in Article 2.2(b) of the O&M Agreement ((i)-(iv), collectively,

the "**O&M Services**").  In effect, and except for certain matters expressly requiring the approval

of the Debtor under the O&M Agreement, EP Ruby is responsible for the operation and

management of the Debtor's business under the O&M Agreement while the Debtor otherwise

maintains ownership of the Facilities.

31.     Under the O&M Agreement, the O&M Services to be provided in any given

Operating Period (*i.e.*, a calendar year) are limited to the budget for the Operating Period (the

---

[11]     The O&M Agreement is a comprehensive document that sets forth more fully the obligations of EP Ruby and the Debtor.  The descriptions of the O&M Agreement provided herein are summaries of the obligations thereunder and are presented for convenience only.  In the event of any ambiguity or inconsistency between the summaries provided for herein and the terms of the O&M Agreement, the terms of the O&M Agreement shall control in all respects.

"**Operating Period Budget**"), subject to permitted variances, as approved by the Debtor.[12] Pursuant to Article 3.2(a) of the O&M Agreement, no less than 45 days before the first day of each Operating Period, EP Ruby prepares and submits to the Debtor a proposed budget for (i) O&M Services containing monthly detail for the performance of O&M Services during the applicable Operating Period, and (ii) if applicable, a capital expense budget regarding any capital expenses that Operator reasonably believes the Facilities should incur during such Operating Period Budget.

32. Prior to the commencement of the Operating Period, the Debtor provides EP Ruby with the Company-approved Operating Period Budget, which becomes the budget for the applicable Operating Period. The Operating Period Budget has been, and continues to be, the product of arm's-length discussions between EP Ruby and the Debtor. To the extent that either EP Ruby or the Debtor wishes to change the Operating Period Budget, the parties work together in good faith to determine the extent of any proposed change. However, the Debtor is under no obligation to agree to any changes proposed by EP Ruby and to the extent EP Ruby proposes a change that the Debtor does not agree to, then no change may be made to the Operating Period Budget.

33. In exchange for providing the O&M Services, pursuant to Article 5.1 of the O&M Agreement, EP Ruby is entitled to payment for its "Direct Costs" and "Indirect Costs". Direct costs include reasonable and necessary cash expenditures, including capital costs and expenses,

---

[12] Approved variances may occur in the event of (i) Force Majeure (any cause not within the reasonable control of a party, including, but not limited to, acts of God, terrorism, fires, explosions, *etc.*) or Emergency (generally an event threatened or occurring at the Facilities that poses imminent or actual risk of serious personal injury or physical damages requiring immediate preventative or remedial action by EP Ruby and for which advance approval by the Debtor would be impossible or impracticable, or (ii) if EP Ruby becomes aware that the aggregate of all budget categories exceeds or is reasonably likely to exceed: (A) for any quarter, the amount provided for that quarter in the Operating Period Budget by ten percent (10%) or more or (B) for any year, the amount provided for that year in the Operating Period Budget by seven and one-half percent (7.5%) or more, EP Ruby shall promptly provide the Debtor notice of such variance or potential variance; provided the EP Ruby may not make expenditures exceeding the foregoing amounts or inconsistent with the Operating Period budget without the Debtor's prior written approval.

for among other things, the performance of the O&M Services and performance of other such duties exclusively related to the Facilities as are reasonably necessary and prudent to comply with EP Ruby's duties and responsibilities under the O&M Agreement that are not otherwise Indirect Costs. Indirect Costs include costs that are incurred by KMI and its affiliates in providing services for the collective benefit of KMI's subsidiaries, including the Debtor. Indirect Costs are allocated fairly to the Debtor in proportion to the benefits received from such services as set forth on Exhibit B to the O&M Agreement. Pursuant to Article 5.1(c) of the O&M Agreement, there is no markup or profit component for any Direct Costs or Indirect Costs billed to the Debtor.

34. EP Ruby bills the Debtor one month in advance and, subject to reconciling the prior month's invoice, trues up the invoices by offering the Debtor a credit for future months or by increasing or decreasing the current invoice, as applicable. In the twelve months preceding the Petition Date, the Debtor paid approximately $8.6 million to EP Ruby under the O&M Agreement for Direct Costs and Indirect Costs.

*ii. Construction Management Agreement*

35. In addition to the O&M Agreement, the Debtor and CIG Services, as Construction Manager thereunder, were also party to that certain *Construction Management Agreement*, dated August 13, 2009 (the "**CMA**").[13] Pursuant to the CMA, CIG Services was responsible for the construction of the Facilities. Currently, EP Ruby acts as the Construction Manager. In addition, EP Ruby is responsible for managing, administering, and overseeing the development of any expansions, extensions or laterals of the Facilities. Among other things, EP Ruby provides the

---

[13] The CMA is a comprehensive document that sets forth more fully the obligations of EP Ruby and the Debtor. The descriptions provided herein are summaries of the obligations under the CMA and are presented for convenience only. In the event of any ambiguity or inconsistency between the summaries provided for herein and the terms of the CMA, the terms of the CMA shall control in all respects.

employees necessary to fulfill its obligations under the CMA and has the sole discretion to manage the employees provided under the CMA. EP Ruby is also responsible for (i) managing, administering and overseeing the development of the Facilities, (ii) entering into contracts with contractors, vendors, consultants, service or other organizations on behalf of and in the name of the Debtor, (iii) managing contractors, vendors, consultants, service or other organizations employed to carry out its duties under the CMA, (iv) pursuing and managing the receipt of any necessary governmental approvals and the acquisition of rights-of-way associated with the Facilities, and (v) those other services set forth in Article 2.2(b) of the O&M Agreement ((i)-(v), collectively, the "**Management Services**").

36.     In exchange for providing the Management Services, EP Ruby is entitled to, among other things: (a) the reimbursement of its internal costs, which includes (i) an allocated cost for employees or contract labor of EP Ruby and its affiliates who provided Management Services, (ii) out-of-pocket expenses of employees associated with the provision of the Management Services, (iii) the cost of all materials consumed in the performance of the Management Services, (iv) the cost of operating any field or on-site offices, (v) out-of-pocket expenses incurred in connection with providing the Management Services, (vi) taxes, and all excise and licensee fees, and (vi) any costs related to any stand-alone insurance policies necessary under the CMA; (b) an amount necessary to compensate EP Ruby and its affiliates for overhead expenses of (i) its engineering services groups, (ii) its shared service functions, (iii) its pipeline services functions, (iv) general insurance costs, and (v) pipeline general and administrative costs; and (c) reimbursement of any costs to employ third parties or subcontractors in carrying out its duties under the CMA.

37.     Billing procedures under the CMA are substantially similar to the billing practices for the O&M Agreement. Often times, EP Ruby bills the Debtor under the O&M Agreement and

15

CMA in the same invoice.  In the twelve months preceding the Petition Date, the Debtor paid *de minimis* amounts to EP Ruby under the CMA.

### *iii.   Upstream Capacity Agreement*

38.     On January 1, 2014, the Debtor and Wyoming Interstate Company, L.L.C. ("**WIC**"), a wholly owned KMI affiliate, entered into that certain *First Amended and Restated Upstream Pipeline Capacity Agreement* (the "**Upstream Capacity Agreement**"), pursuant to which WIC agreed to offer natural gas transportation services to shippers desiring to transport natural gas volumes to the inlet of the Ruby Pipeline at Opal, Wyoming by acquiring capacity on other pipelines.  The Debtor agreed to reimburse WIC for any unsubscribed off-system capacity that WIC acquired.  In the twelve months preceding the Petition Date, the Debtor has not made any reimbursement payments to WIC under the Upstream Capacity Agreement.  The Upstream Capacity Agreement expired in July 2021.

### *iv.   Colorado Interstate Gas Pipeline Agreements*

39.     On July 16, 2010, Colorado Interstate Gas Company, L.L.C. ("**CIG**"), a wholly owned KMI affiliate, and the Debtor entered into that certain *Interconnect Agreement* (the "**CIG Interconnect Agreement**"), whereby, among other things, CIG and the Debtor agreed to interconnect their respective pipelines.  In addition, on October 1, 2015, CIG and the Debtor also entered into that certain *Operational Balance Agreement* (the "**CIG Operational Balancing Agreement**"), whereby, among other things, the parties agreed to certain terms regarding the imbalances (an "**Operational Imbalance**") that may arise from time to time resulting from the difference between amounts of natural gas scheduled to be transported, and actually transported, through the parties' interconnecting pipelines.  As of the Petition Date, (i) there have been no cash outlays made under the CIG Interconnect Agreement in the last 12 months, and (ii) under the CIG

Operational Balancing Agreement, there is an Operational Imbalance of approximately 75,000 dekatherms between the parties in favor of CIG.[14]

### E. Prepetition Capital Structure

40.     As of the commencement of this Chapter 11 Case, the Debtor has approximately $718.875 million outstanding in aggregate principal amount (exclusive of interest), collectively, under (a) the 2022 Unsecured Notes issued pursuant to the Indenture (as defined below) in 2012, (b) the 2026 Subordinated Notes (as defined below) issued between 2017-2021 under the 2017 Note Purchase Agreement (as defined below), and (c) an unsecured obligation under the Klamath Agreement (as defined below) in favor of the Klamath Tribes (collectively, the "**Unsecured Obligations**").   The Unsecured Obligations are set forth in a summary chart, and described in further detail, below.[15]

| Note Series | Maturity Date | Principal Amount Outstanding |
|---|---|---|
| 2022 Unsecured Notes | April 1, 2022 | $475 million |
| 2026 Subordinated Notes | March 31, 2026 | $234.375 million |
| Klamath Agreement | August 1, 2041 | $9.5 million |
| **TOTAL UNSECURED OBLIGATIONS** | | **$718.875 million** |

---

[14]     Under the CIG Operational Balancing Agreement, Operational Imbalances must be reduced to as close to zero as is practicable between the Debtor and CIG.  Where there is an Operational Imbalance at the end of the month, that Operational Imbalance becomes the starting Operational Imbalance for the next month.  Under the CIG Operational Balancing Agreement, there is no requirement to cash out Operational Imbalances unless the Operational Balancing Agreement is terminated.  In the absence of termination, the Debtor and CIG reduce Operational Imbalances based on the scheduled and actual throughput from CIG's pipeline through the Ruby Pipeline.  As of the Petition Date, no cash amounts are due and owing from the Debtor to CIG for the approximately 75,000 dekatherm imbalance.

[15]     The descriptions of the Debtor's unsecured debts set forth herein are provided for convenience only.  In certain cases, amounts stated are approximate.  The descriptions are not intended to be comprehensive, nor should they be construed as an admission with respect to the validity or enforceability of any debt or any other right or obligation.  These descriptions are qualified in their entirety by the operative relevant debt and related documents.  The Debtor is continuing to review its unsecured debt obligations and related matters and expressly reserves all rights relating thereto.

RLF1 27103353v.1

41. Once the Ruby Pipeline was completed, Ruby began exploring the possibility of refinancing its secured indebtedness and replacing it with unsecured indebtedness. On January 1, 2012, the Company had $1.474 billion outstanding under the 2010 Secured Credit Facility.

42. In the first quarter of 2012, the Company implemented the refinancing of the 2010 Secured Facility through (i) issuing Unsecured Notes (as defined below), (ii) borrowing under a new unsecured term loan facility and (iii) utilizing available cash on hand. [16] Specifically, on February 15, 2012, the Company and Wilmington Trust, National Association ("**Wilmington Trust**"), as, among other things, trustee,[17] entered into that certain *Indenture*, dated February 15, 2012, as supplemented by that certain *First Supplemental Indenture*, dated February 15, 2012 (the "**Indenture**"), for the issuance of two series of unsecured notes in the total principal amount of $1.075 billion: (i) $250 million in principal amount of unsecured notes, maturing on April 1, 2017 (the "**2017 Unsecured Notes**"), bearing interest at 4.5% per annum and payable in semi-annual installments thereon (all as subject to the terms of the Indenture); and (ii) $825 million in principal amount of unsecured notes, maturing on April 1, 2022 (the "**2022 Unsecured Notes**" and, together with the 2017 Unsecured Notes, the "**Unsecured Notes**"), bearing interest at 6.0% per annum and payable thereon in semi-annual installments (all as subject to the terms of the Indenture).[18] On

---

[16] The Company entered into an unsecured term loan facility with a syndicate of lenders, with Société' Générale as administrative agent thereunder, in the amount of $350,000,000 that matured in 2017 and was repaid in full, and also entered into a working capital facility with a syndicate of lenders, with BNP Paribas as administrative agent thereunder, in the amount of $25 million that matured in 2017 and was repaid in full.

[17] On October 15, 2021, the Debtor, Wilmington Trust, and Wilmington Savings Fund Society, FSB ("**WSFS**") entered into that certain *Agreement Confirming Appointment and Acceptance* whereby WSFS replaced Wilmington Trust as the Successor Trustee under the Indenture.

[18] As a result of ratings downgrades from S&P, Moody's Investors Services and Fitch Ratings Inc., pursuant to the two Global Notes issued in connection with the 2022 Unsecured Notes, the interest rate therefor has been increased by 200 basis points and currently bears interest at 8% per annum.

April 1, 2017, the Company repaid the 2017 Unsecured Notes in full from the proceeds received under the 2017 Term Loan (as defined below).

43.     Under the 2022 Unsecured Notes, commencing on October 1, 2017 and ending on April 1, 2021, the Company became obligated to redeem $43.75 million of the 2022 Unsecured Notes on the first day of each April and October.  Since October 1, 2017, the Company has complied with its obligations, repaid the principal in accordance therewith, and, as of the Petition Date, the outstanding principal balance under the 2022 Unsecured Notes has been paid down from $825 million to $475 million.

ii.     *2026 Subordinated Notes*

44.     On March 31, 2017, the Company, as borrower, and Royal Bank of Canada, as administrative agent, entered into that certain *Term Loan Agreement* (as amended from time to time, the "**2017 Term Loan Agreement**") providing the Company with $250 million in term loan financing maturing on April 31, 2021.  Proceeds from the 2017 Term Loan Agreement were used to repay the 2017 Unsecured Notes in full.  Pursuant to the 2017 Term Loan Agreement, the Company was required to repay $15.625 million in principal per quarter.

45.     On March 31, 2017, the Company, EP Ruby and Veresen U.S. Infrastructure Inc. (n/k/a Pembina U.S. Corporation) (together, the "**Note Purchasers**") entered into that certain *Subordinated Note Purchase Agreement* (as amended from time to time, the "**2017 Note Purchase Agreement**"), for the sale and purchase of certain subordinated notes (the "**2026 Subordinated Notes**") bearing interest at 10% per annum and payable in quarterly installments thereon with a maturity date of March 31, 2026.  The 2017 Note Purchase Agreement contemplated a commitment of up $125 million for each Note Purchaser.  In 2017, 2018 and 2019, the Company

19

received proceeds under the 2017 Note Purchase Agreement, in the amounts of $46.875 million, $62.5 million, and $46.875, respectively, to paydown the 2017 Term Loan.

46.     On April 27, 2020, the Company, as borrower, and ATB Financial, as administrative agent, lead arranger and bookrunner, entered into that certain *Term Loan Agreement* (as amended from time to time, the "**2020 Term Loan Agreement**") providing the Debtor with $62.5 million in term loan financing.  The proceeds of the 2020 Term Loan Agreement were used to repay the outstanding balance, as of April 27, 2020, remaining under the 2017 Term Loan in full.

47.     In 2020, the Company received proceeds under the 2017 Note Purchase Agreement, in the amount of $62.5 million to paydown the 2020 Term Loan, and on January 6, 2021, the Company received additional proceeds under the 2017 Note Purchase Agreement in the amount of $15.625 million to further paydown the 2020 Term Loan.  On March 6, 2021, the Company repaid the remaining balance under the 2020 Term Loan in full from its available cash on hand without further borrowing under the 2017 Note Purchase Agreement.  As of the Petition Date, the outstanding principal balance of the 2026 Subordinated Notes issued under the 2017 Note Purchase Agreement is $234.375 million.

### iii.     Project Acceleration and Mitigation Agreement

48.     In connection with the construction of the Ruby Pipeline, the Debtor and the Klamath Tribes, a federally-recognized Indian Tribe, entered into that certain *Project Acceleration and Mitigation Agreement*, dated December 2, 2010 (the "**Klamath Agreement**"), pursuant to which the Debtor agreed to support a Living Cultural Center for the Klamath Tribes as a result of the potential damage or destruction to certain cultural resources of great significance to the

Klamath Tribes expected to be caused by the construction of the Ruby Pipeline.[19]  Pursuant to the Klamath Agreement, the Debtor was required to fund $5 million into an escrow account for the benefit of the Klamath Tribes.  In March 2011, $1.5 million was authorized to be released to the Klamath Tribes, and on the first day of the month following the Ruby Pipeline commencing service (August 2011), the balance of the amounts held in escrow was released to the Klamath Tribes. Under the Klamath Agreement, upon the release of the funds held in escrow, the Company became obligated to make an annual payment to the Klamath Tribes, in the amount of $500,000, through and including 2041.  As of the Petition Date, the undiscounted face amount of the aggregated future annual payments under the Klamath Agreement is $9.5 million.[20]

## IV.    Circumstances Leading to the Commencement of the Chapter 11 Case

### A. Debt Maturity

49.    The driving cause of the Debtor's bankruptcy filing is the size of its outstanding obligations under the 2022 Unsecured Notes and its current cash position.  On April 1, 2022, the 2022 Unsecured Notes mature, and the Debtor is obligated to repay the $475 million in outstanding principal thereunder, as well as interest in the amount of $19 million.  But as of the date hereof, the Debtor has only approximately $113 million in cash and cash equivalents, which is an insufficient amount of funding to repay the 2022 Unsecured Notes in accordance with their terms.

---

[19]    In connection with the Klamath Agreement, among other things, El Paso (n/k/a KMI) executed a promissory note guaranty, dated December 2, 2010, in favor of the Klamath Tribes guaranteeing the Debtor's obligations under the Klamath Agreement.

[20]    Under the Klamath Agreement, after the fifth anniversary of the in-service date of the Ruby Pipeline, the Klamath Tribes have the right at any time to call for a lump-sum payment of an amount that represents the net present value of the remaining payment stream due from the Debtor to the Klamath Tribes, all as more fully set forth in the Klamath Agreement.

RLF1 27103353v.1

### B. Decreased Production in the Rocky Mountain Natural Gas Basins and Re-Contracting Firm Contracts

50.     While the market economics supported growth in natural gas production from the Rocky Mountain basins in the late 2000s, since the shale boom in the early 2010s, the price of natural gas during the 2010s has largely been at a level below what is required for natural gas producers in the Rocky Mountain basins to return a profit.  As a result, exploration and production of natural gas has declined in the Rocky Mountain basins and less natural gas has been transported through western natural gas pipelines, including the Ruby Pipeline.

51.     The decrease in exploration and production in the Rocky Mountain basins has adversely affected the Debtor's efforts to re-contract with parties to Firm Contracts.  As discussed, *supra*, the Debtor's business model centers around the Debtor entering into Firm Contracts with third-party shippers of natural gas.  Prior to July 2021, the Debtor sold approximately 84% of Ruby Pipeline's maximum capacity to firm commitment parties under Firm Contracts.  However, in July 2021, approximately 54% of those Firm Contracts rolled off (*i.e.*, expired), subjecting the Debtor to re-contracting risk in the form of either (i) reduced contract rates or (ii) third-party shippers opting not to execute a further Firm Contract (many of which have opted not to re-contract).

52.     In an effort to mitigate its re-contracting risk in the near future, the Debtor has been in discussions with its Firm Contact counterparties and, in particular, PG&E, one of its anchor shippers that has contractual step-down rights of 20% each year on its existing long-term Firm Contract through its 2026 expiration.  The Debtor believes that it is imperative that it reach agreement with its Firm Contract counterparties on re-contracting through the terms of new Firm Contracts or that it contract with suitable replacement shippers.

53.     While the Debtor has endeavored to re-contract with its shippers and sell the capacity of the Ruby Pipeline under Firm Contracts, challenging macroeconomic fundamentals

22

have depressed demand for Rocky Mountain basin natural gas and has created a difficult re-contracting environment for the Debtor. Despite the Debtor's best efforts, only 40% of the Ruby Pipeline's maximum capacity is subject to Firm Contracts, down from approximately 84% as of July 2021. Further, over the course of 2022, approximately 38% of those Firm Contracts are set to expire, subjecting the Debtor to further re-contracting risk.

54. As the percentage of the Ruby Pipeline's capacity subject to Firm Contracts continues to fall, so too does the Debtor's revenue stream. While the Debtor may provide intermittent services pursuant to Interruptible Contracts, such services do not generate the revenues that Firm contracts generate because, under Interruptible Contracts, there is no requirement to pay a reservation fee for Ruby Pipeline's capacity. Indeed, less than .1% of the Debtor's revenues have come from Interruptible Contracts historically. Thus, in the absence of other potential revenue streams being generated, it is critical that the Debtor re-contract with parties to Firm Contracts or with replacement shippers.

55. As Firm Contracts continue to roll off without re-contracting, current market conditions have caused pressure on the Debtor's business, reduced the Debtor's expected future cash positions, made repayment of the 2022 Unsecured Notes impracticable at this time, and made negotiations regarding its future more difficult. Accordingly, the Debtor believes that the commencement of this Chapter 11 Case is necessary for the Debtor to address the maturity of its 2022 Unsecured Notes while simultaneously working to solidify its future in a challenging market environment.

### C. Path to Restructuring

56. The Debtor has sufficient cash on hand to fund this Chapter 11 Case without additional financing but not enough cash on hand to repay the 2022 Unsecured Notes. While the

23

Debtor does not yet have a firm exit path for this Chapter 11 Case set, the Debtor intends to use the breathing space afforded by chapter 11 to maximize value for its estate by exploring various value enhancing measures including, but not limited to: (i) continuing its discussions with the Ad Hoc Group, (ii) exploring all possible restructuring alternatives, including a potential sale pursuant to section 363 of the Bankruptcy Code and/or a chapter 11 plan or the consummation of a plan of reorganization, (iii) continuing to re-contract its Firm Contracts that have either rolled, or that will roll, off in the near future, and (iv) continuing to finalize an extension of PG&E's Firm Contract, which will continue to serve as a foundation for the Debtor's business.

57.     Given the recent global turbulence in the energy markets, there is a renewed interest in energy independence for the United States, and interest by many European nations in importing U.S. sourced natural gas, which will further drive demand for natural gas and liquefied natural gas exports from the United States to global markets. Such increase in overall demand for U.S. natural gas would be expected to result in increased natural gas production in the U.S. and improve market fundamentals for natural gas pipelines such as the Ruby Pipeline.

58.     While the market outlook for natural gas is improving and the future looks promising, in the near term, the Debtor needs additional time to negotiate with the Ad Hoc Group and time to utilize the chapter 11 process to identify and execute a value maximizing transaction for the benefit of its estate, creditors and all stakeholders, such that its business will be ready to rebound when market fundamentals recover.

RLF1 27103353v.1

## V.     The First Day Motions[21]

59.     Concurrently with the filing of this Chapter 11 Case, the Debtor filed the First Day Motions seeking relief related to: (i) the administration of the Chapter 11 Case; (ii) the Debtor's vendors and customers; (iii) its operations; and (iv) its cash management system.  I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm and allow the Debtor to operate with minimal disruption during the pendency of its Chapter 11 Case.

60.     Below is a brief discussion of the Debtor's First Day Motions and an explanation of why, in my belief, the relief requested in such motions is critical to the successful prosecution of this Chapter 11 Case.  More fulsome descriptions of the facts regarding the Debtor's operations, and the bases for the relief requested in the operational motions, can be found in each relevant First Day Motion.

### A.  Administrative Application

   *i.   Application of Debtor for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent* (the "**Claims Agent Application**")

61.     Pursuant to the Claims Agent Application, the Debtor seeks entry of an order appointing Kroll Restructuring Administration LLC ("**Kroll**") as the Claims and Noticing Agent for the Debtor in its Chapter 11 Case, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Case.  Kroll is a leading chapter 11 administrator, with significant experience in noticing, claims administration, solicitation, balloting and other administrative aspects of chapter 11 cases.  Given

---

[21]     Capitalized terms used but not otherwise defined in this Part V First Day Motions shall have the same meanings ascribed to such terms as in the applicable First Day Motion.

the complexity of this Chapter 11 Case and the number of creditors and other parties in interest involved, I believe that appointing Kroll as the Claims and Noticing Agent in the Chapter 11 Case will maximize the value of the Debtor's estate for all of its stakeholders. [22]

### B. Substantive Motions

   i. *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor (A) to Continue Use of Its Existing Cash Management System, Bank Accounts, Checks, and Business Forms, and (B) to Pay Related Prepetition Obligations, (II) Waiving the Section 345(b) Deposit and Investment Requirements and (III) Granting Related Relief* (the "**Cash Management Motion**")

62.     Pursuant to the Cash Management Motion, the Debtor seeks entry of Interim and Final Orders (a) authorizing, but not directing, the Debtor to continue (i) use of its existing cash management system, bank accounts, checks, and business forms, and (ii) payment of related prepetition obligations, (b) waiving the deposit and investment requirements of section 345(b) of the Bankruptcy Code, and (c) granting related relief.

63.     As detailed in the Cash Management Motion, to facilitate the efficient operation of its business, the Debtor uses the Cash Management System to collect, transfer, and disburse funds generated by its operations. The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtor to maintain control over the administration of three bank accounts (the "**Bank Accounts**").

64.     The Debtor's sole Bank for operation of the Cash Management System is JPMorgan, where the Debtor maintains the Operating Account, the Disbursement Account, and the Money Market Account. The Cash Management System is tailored to meet the Debtor's operating needs, thereby enabling the Debtor to control and monitor funds, ensure cash availability

---

[22]     In accordance with the Claims Agent Protocol, Kroll was selected following the Debtor's competitive solicitation of at least three separate proposals for potential claims and noticing agents.

and liquidity, fund its operations, and reduce administrative expenses by facilitating the efficient movement of funds and the development of accurate account balances.

65.     To preserve a "business as usual" atmosphere, by the Cash Management Motion, the Debtor is requesting that it be permitted to continue to use its Bank Accounts with the same account numbers.  I have been informed that, absent this relief, the UST Guidelines would require the Debtor to close all of its prepetition Bank Accounts and open new accounts, which will, among other things, disrupt the Debtor's business operations and require new depository agreements. Accordingly, I believe that allowing the Debtor to continue to use its prepetition Bank Accounts will assist the Debtor in accomplishing a smooth transition to chapter 11.

66.     In the ordinary course of its business, the Debtor uses a multitude of Business Forms.  As detailed in the Cash Management Motion, the Debtor is seeking the authorization to continue using the Business Forms without alteration or change and without reference to the Debtor's status as debtor-in-possession; *provided*, *however*, that, with respect to checks that the Debtor or its agents print themselves, the Debtor will begin printing the "Debtor in Possession" legend and include the bankruptcy case number on such checks within ten business days after the date of entry of the Interim Order.  Further, consistent with Local Rule 2015-2, to the extent that the Debtor orders check stock, the Debtor will require that such check stock include the "Debtor in Possession" legend and bankruptcy case number.  I believe this relief is necessary in order to, among other things, demonstrate to the Debtor's vendors and customers that it is "business as usual".  Further, I believe that modifying all of the Business Forms to include the "Debtor in Possession" legend and the corresponding case number will force the Debtor to incur a potentially significant expense without any real attendant benefit to the Debtor and its stakeholders.

27

67.     Finally, as detailed in the Cash Management Motion, the Debtor is seeking a 30-day extension of the time to comply with section 345(b) of the Bankruptcy Code under the Interim Order, and, subject to the entry of the Final Order, a waiver of the requirements of section 345(b) of the Bankruptcy Code.  It is my understanding, based on the advice of counsel, that the Debtor is in compliance with such section with respect to the Operating Account and Disbursement Account, and that the Debtor intends to come into compliance with such section, pursuant to Local Rule 4001-3, with respect to the Money Market Account during the Interim Period.  However, to ensure that there are no interruptions in the Debtor's ability to use its cash pursuant to the Cash Management System, the Debtor is requesting a brief extension of the time to comply with such section so that the Debtor can work cooperatively with the U.S. Trustee to confirm that the Debtor is in compliance with such section or otherwise come into compliance.

68.     Based on the foregoing and those additional reasons set forth in the Cash Management Motion, I believe that the relief requested in the Cash Management Motion is both necessary and appropriate to allow the Debtor to successfully prosecute this Chapter 11 Case, to optimize the Debtor's postpetition business performance, and to maximize the value of the Debtor's estate.

   ii.   *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor (A) to Maintain Existing Insurance and Bonding Programs and Pay All Obligations Arising Thereunder and (B) to Renew, Revise, Extend, Supplement, Change, or Obtain New Insurance Policies and Surety Bonds; and (II) Granting Related Relief* (the "**Insurance Motion**")

69.     Pursuant to the Insurance Motion, the Debtor seeks entry of Interim and Final Orders (a) authorizing, but not directing, the Debtor (i) to maintain its existing Insurance and Bonding Programs and pay on an uninterrupted basis, whether arising prepetition or postpetition, all Insurance and Bonding Obligations, and (ii) to renew, revise, extend, supplement, change, or

28

obtain new insurance coverage and/or surety bonds as needed in its business judgment without further order of this Court; (b) authorizing the Banks to receive, process, honor, and pay any and all Payments on account of the Insurance and Bonding Obligations to the extent directed by the Debtor in accordance with the Insurance Motion; (c) authorizing, but not directing, the Debtor to issue new postpetition checks or effect new postpetition fund transfers or other new postpetition Payments to replace any checks, drafts, and other forms of payment, including fund transfers, which may be inadvertently dishonored or rejected; (d) authorizing, but not directing, the Debtor to continue in its ordinary course to make payments and pay certain fees on account of the Insurance and Bonding Obligations; and (e) granting related relief, all as set forth more fully in the Insurance Motion.

70.     In the ordinary course of business, the Debtor's operator, EP Ruby, facilitates the Debtor's coverage as an additional insured party under the KMI Insurance Program. The Debtor also has paid directly for certain D&O Policies and maintains certain surety bonds to secure its payment or performance of certain Bonded Obligations as may be required by contracts, statutes, rules and/or regulations. I have been informed that, as of the Petition Date, the Debtor is not aware of any prepetition amounts owed with respect to its Insurance and Bonding Programs. Nevertheless, out of an abundance of caution and to account for potential variances between the Debtor's estimated obligations and any obligations that may have accrued as of the Petition Date, the Debtor is seeking authority to make any payments necessary to continue the Insurance and Bonding Programs.

71.     I have been informed that failure to satisfy Insurance and Bonding Obligations and maintain the Insurance and Bonding Programs could result in the cancellation of certain of the Debtor's insurance policies or surety bonds, the Debtor's inability to obtain renewal of its

insurance policies or its surety bonds on terms that are as competitive, and the violation of the UST Guidelines, the various applicable federal and state laws and regulations, various contractual commitments, and the fiduciary duties of the debtor in possession. Accordingly, based on the foregoing and those additional reasons set forth in the Insurance Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estate, its creditors and all other parties in interest.

      iii.  *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* (the "**Taxes Motion**")

72.     Pursuant to the Taxes Motion, the Debtor seeks entry of Interim and Final Orders (i) authorizing, but not directing, the Debtor to remit and pay, in its discretion, Prepetition Taxes and Fees to the Authorities in the ordinary course of business and (ii) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the foregoing to the extent directed by the Debtor in accordance with the Taxes Motion. In the ordinary course of business, the Debtor incurs an assortment of taxes and fees (the **"Taxes and Fees"**) that it remits periodically to various federal, state and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "**Authorities**"). The Debtor estimates that approximately up to $4,000,000 in prepetition Taxes and Fees may have accrued. The Debtor seeks authority to pay up to $100,000 of such amount upon entry of the Interim Order and the balance upon entry of the Final Order.

73.     As detailed in the Taxes Motion, the Taxes and Fees generally fall into the following categories: ad valorem taxes, use or consumption taxes, franchise taxes, and certain regulatory fees and charges. There are several justifications for paying the Taxes and Fees pursuant to the relief sought in the Taxes Motion. Initially, I have been informed that such Taxes

and Fees may not be property of the Debtor's estate and may be held in trust for the Authorities. The Debtor also seeks to pay certain Taxes and Fees to, among other things, forestall the Authorities from taking any actions that may interfere with the Debtor's administration of this Chapter 11 Case. I have further been informed that such interference may potentially result in certain of the Authorities bringing personal liability against officers of the Debtor, asserting liens on the Debtor's property, revoking the Debtor's right to conduct its business, or assessing penalties and significant interest on past due taxes. In addition, I have been told by the Debtor's advisors that non-payment of the Prepetition Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, based on the foregoing and those additional reasons set forth in the Taxes Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interest of the Debtor's estate, its creditors and all other parties in interest.

    *iv. Motion of the Debtor for Entry of Interim and Final Orders (A) Approving the Debtor's Proposed Form of Adequate Assurance of Payment, (B) Establishing Procedures for Resolving Objections By the Utility Companies, (C) Prohibiting the Utility Companies From Altering, Refusing, or Discontinuing Service and (D) Granted Related Relief* (the "**Utilities Motion**")

74. Pursuant to the Utilities Motion, the Debtor seeks entry of Interim and Final Orders (i) approving the Debtor's proposed form of adequate assurance of payment, (ii) establishing procedures for resolving objections by the Utility Companies, and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to the Debtor on the basis of the commencement of this Chapter 11 Case, any unpaid prepetition charges, or any perceived inadequacy of the Adequate Assurance Deposit.

75. The Debtor intends to pay all postpetition obligations owed to Utility Companies in a timely manner and has sufficient funds to do so. Nevertheless, to provide additional assurance

of payment to the Utility Companies, the Debtor proposes to deposit approximately $359,790.06 (the "**Adequate Assurance Deposit**") into a newly created, segregated account for the benefit of the Utility Companies (the "**Utility Deposit Account**") within twenty (20) days of the Petition Date. The amount of the Adequate Assurance Deposit equals approximately one half of the Debtor's average monthly cost of Utility Services during the year 2021.

76. I believe that uninterrupted Utility Services are essential to the Debtor's business operations during the pendency of this Chapter 11 Case. The Debtor relies on the Utility Companies to provide, among other things, electric power to operate the Compressors, which provide compression necessary for the operation of the Ruby Pipeline. Preserving the Utility Services on an uninterrupted basis is essential to the Debtor's ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtor's business. Accordingly, based on the foregoing and as further set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estates, its creditors, and all other parties in interest.

> v. *Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to Pay Certain Prepetition Claims of Critical Vendors* (the "**Critical Vendors Motion**")

77. Pursuant to the Critical Vendors Motion, the Debtor seeks entry of Interim and Final Orders (i) authorizing, but not directing, the Debtor to pay, in its sole discretion in the ordinary course of business, some or all of the Critical Vendor Claims not to exceed a total of $1,800,000, with up to $500,000 available for such payments upon entry of an Interim Order by the Court and up to $1,800,000 available for such payments upon entry of an Final Order by the Court and (ii) granting related relief.

RLF1 27103353v.1

78.     As described in the Critical Vendors Motion, the Debtor's business is dependent upon its ability to continue to facilitate operation of the Facilities, which, in turn, is dependent upon the Debtor's access to various goods and services provided by certain suppliers and providers.  The transportation section of the midstream sector in which the Debtor operates requires the Debtor to rely heavily upon certain Critical Vendors to provide personnel (the Debtor has no employees of its own), services, equipment and parts.  Without these people, goods and services, the Debtor's business would suffer severe disruption, impairing the Debtor's ability to operate smoothly in chapter 11.  To prevent any unexpected or inopportune interruption to the Debtor's business during this Chapter 11 Case, it is essential that the Debtor maintains its relationship with, and honor its outstanding payment obligations to, the Critical Vendors.

79.     I will instruct the Debtor and its advisors to use commercially reasonable efforts to require the applicable Critical Vendors to provide favorable trade terms consistent with historical practice.  The Debtor therefore requests authority, but not direction, to condition payment on such Critical Vendor's agreement to continue providing equipment or services to the Debtor in accordance with trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, within the 12 month period prior to the Petition Date.

80.     Accordingly, based on the foregoing and as further set forth in the Critical Vendors Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.

81.     The Debtor has narrowly tailored the relief requested in the First Day Motions to meet its goals of: (a) continuing its current operations in chapter 11 with as little disruption as

possible; (b) maintaining the confidence and support of its vendors, and other key constituencies and stakeholders; and (c) efficiently administering this Chapter 11 Case.

82.     I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers, employees, and advisors.  I incorporate by reference the factual statements in each of the First Day Motions as though fully set forth herein.

83.     I believe that the relief sought in each of the First Day Motions is necessary to the successful implementation of the Debtor's efforts to maximize the value of its estate.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the maintenance of the Debtor's operations and necessary to avoid immediate and irreparable harm to the Debtor's estate, its creditors and all parties in interest.

84.     The success of this Chapter 11 Case depends upon the Debtor's ability to preserve its operations while it continues to negotiate with key stakeholders, including the Ad Hoc Group, as it works to formulate the value maximizing exit from chapter 11.  The relief requested in the First Day Motions is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

85.     Accordingly, I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on:  April 1, 2022
                          Houston, Texas

/s/        *Will W. Brown*
Will W. Brown
Vice President, Commercial
Kinder Morgan Natural Gas
Pipelines West Region

**Exhibit A**

**Corporate Structure**

# Ruby Pipeline Organizational Structure

