# **EXHIBIT B**

**Engagement Letter**



**FTI Consulting, Inc.**
1301 McKinney St.
Suite 3500
Houston, TX 77010
713.353.5400 telephone
832.383.7570 facsimile

www.fticonsulting.com

<u>CONFIDENTIAL</u>

April 1, 2022

Will Brown
Vice President, Commercial
Ruby Pipeline, L.L.C.
1001 Louisiana Street
Houston, TX 77002

Re:  <u>Ruby Pipeline</u>

Dear Will:

The purpose of this letter is to confirm the understanding and agreement (the "Agreement") between Ruby Pipeline, L.L.C. (the "Client" or the "Company") and FTI Consulting, Inc. ("FTI") concerning the Client's engagement of FTI (the "Engagement") to provide certain temporary employees to the Client to provide restructuring and interim management services (the "Services") in connection with the Client's financial restructuring and chapter 11 bankruptcy case, pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and styled as *In re Ruby Pipeline, L.L.C.*, Case No. 22-10278 (CTG) (the "Chapter 11 Case"). This Agreement is effective on April 1, 2022 (the "Effective Date"). The FTI Standard Terms and Conditions attached hereto as Exhibit "A" are also incorporated herein and forms part of this Agreement.

1.  **Temporary Officers, Hourly Temporary Employees and Services**

FTI will provide David Rush to serve as the Client's Chief Restructuring Officer (the "CRO" and the "Temporary Officer") reporting to the Special Committee of the Board of Managers of the Company (the "Special Committee"), in connection with the Engagement. The Temporary Officer, as well as any additional Hourly Temporary Staff, (as defined below), shall have such duties as the Special Committee may from time to time determine, and shall at all times report to and be subject to supervision by the Special Committee. Without limiting the foregoing, the Temporary Officer, as well as any Hourly Temporary Staff, shall work with other senior management of the Client, and other professionals, to provide the Services.

In addition to providing the Temporary Officer, FTI may also provide the Client with additional staff (the "Hourly Temporary Staff" and, together with the Temporary Officer, the "FTI Professionals"), subject to the terms and conditions of this Agreement. The Hourly Temporary Staff may be assisted by or replaced by other FTI professionals reasonably satisfactory to the Special Committee, as required, who shall also become Hourly Temporary Staff for purposes hereof.  FTI will keep the Special Committee reasonably informed as to FTI's staffing to the assignment and will not add additional Hourly Temporary Staff to the assignment without first consulting with the Special Committee.

In connection with the Company's Chapter 11 Case, our role will include serving as principal bankruptcy financial advisors to the debtor and debtor in possession in the Chapter 11 Case, subject to Bankruptcy Court approval. The services we will provide in connection with the Engagement will encompass all

services normally and reasonably associated with this type of engagement that we are requested and are able to provide and that are consistent with our ethical obligations.  With respect to all matters of our Engagement, we will coordinate closely with the Special Committee as to the nature of the services that we will render and the scope of our engagement.

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders.  However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

The engagement of FTI to perform the Services shall be subject to the approval of the Bankruptcy Court and shall be substantially as provided in this Agreement as modified by the retention order approved by the Bankruptcy Court. Client agrees, at Client's expense, to file an application (the "Application") to employ FTI as crisis and turnaround manager *nunc pro tunc* to the Effective Date pursuant to § 363 of the Bankruptcy Code. The Client agrees to file all required applications, including the Application, for the employment or retention of FTI at the earliest practical time.

The Services do not include (i) audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services which are typically outsourced and which shall be obtained directly where required by the Client at Client's expense; or (ii) investment banking, including valuation or securities analysis, including advising any party or representation of the Client on the purchase, sale or exchange of securities or representation of the Client in securities transactions. FTI is not a registered broker-dealer in any jurisdiction and will not offer advice or its opinion or any testimony on valuation or exchanges of securities or on any matter for which FTI is not appropriately licensed or accredited. An affiliate of FTI is a broker-dealer but is not being engaged by the Client to provide any investment banking or broker-dealer services. The Client agrees to supply office space, and office and support services to FTI as reasonably requested by FTI in connection with the performance of its duties hereunder.

**2.     Compensation to FTI**

Fees in connection with this Engagement will be based upon the time incurred providing the Services, multiplied by our standard hourly rates, summarized as follows:

**United States**

| | Per Hour (USD) |
|---|---|
| Senior Managing Directors | $975 – 1,325 |
| Directors / Senior Directors / Managing Directors | 735 –   960 |
| Consultants/Senior Consultants | 395 –   695 |
| Administrative / Paraprofessionals | 160 –   300 |

In addition to the fees outlined above, FTI will bill for reasonable direct expenses which are likely to be incurred on your behalf during this Engagement. Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement such as internet access, telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to this engagement.  Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by you at its standard hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

We will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above.  Each invoice will constitute a request for an interim payment in accordance with the orders of the Bankruptcy Court, including any order approving FTI's retention.

The Company agrees to promptly notify FTI if the Company or any of its subsidiaries or affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of FTI involved in this Engagement and agrees that FTI has earned and is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to FTI's former principal or employee that the Company or any of its subsidiaries or affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by FTI with respect to this Engagement.

In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the Bankruptcy Court.  In most cases of this size and complexity, on request of a party in interest, the Bankruptcy Court permits the payment of interim fees during the case.  The Company agrees that, if asked to do so by us, the Company will request the Bankruptcy Court to establish a procedure for the payment of interim fees during the Chapter 11 Case that would permit payment of interim fees.  If the Bankruptcy Court approves such a procedure, we will submit invoices on account against our final fee.  These interim invoices will be based on such percentage as the Bankruptcy Court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such Bankruptcy Court approval or at such time thereafter as instructed by the Bankruptcy Court.  The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the Bankruptcy Court, the Company shall nevertheless remain liable for payment of Bankruptcy Court approved post-petition fees and expenses.  Such items are afforded administrative priority under 11 U.S.C. § 503(b)(l).  The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1l29(a)(9)(A), that a plan cannot be confirmed unless these priority claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment).

Additional Provisions Regarding Fees:

   a) FTI may stop work or terminate the Agreement immediately upon the giving of written notice to the Client (i) if payments are not made in accordance with this Agreement, (ii) if the Application is not approved by the Bankruptcy Court, (iii) if the Chapter 11 Case is dismissed or converted to a Chapter 7 proceeding, or (iv) if a Chapter 11 Trustee or other responsible person is appointed.

   b) If, and only if, local Bankruptcy rules or the order approving the Application so require, FTI shall file with and serve on creditors entitled to notice thereof, a statement of staffing, professional services, compensation or expenses, on a quarterly basis, or as the Bankruptcy Court or rules may direct, and creditors and other parties in interest shall have an opportunity to object thereto and request a hearing thereon.  In the event that FTI is employed post-petition as a "professional person" pursuant to § 327 of the Bankruptcy Code, Bankruptcy Court approval will generally be required to pay FTI's fees and expenses for Post-petition Services. In most cases of this size and complexity, on request of a party in interest, the Bankruptcy Court permits the payment of interim fees during the case. The Client agrees that in this situation it will, at the Client's expense, request the Bankruptcy Court to establish a procedure for the payment of interim fees during the Chapter 11 Case that would permit payment of interim fees. If the Bankruptcy Court approves such a

    procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the Bankruptcy Court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our Engagement.

c) Any unpaid post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such Bankruptcy Court approval or at such time thereafter as instructed by the Bankruptcy Court. The Client understands that while the arrangement in this paragraph may be altered in whole or in part by the Bankruptcy Court, the Client shall nevertheless remain liable for payment of Bankruptcy Court approved post-petition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503(b)(l). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1l29(a)(9)(A), that a plan cannot be confirmed unless administrative claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment).

d) Client agrees that FTI is not an employee of the Client and the FTI employees and independent FTI contractors who perform the Services are not employees of the Client, and they shall <u>not</u> receive a W-2 from the Client for any fees earned under this engagement, and such fees are not subject to any form of withholding by the Client. The Client shall provide FTI a standard form 1099 on request for fees earned under this Engagement.

e) Copies of Invoices shall be sent by email as follows:

<u>To the Client at</u>:
Ruby Pipeline, L.L.C.
1001 Louisiana Street
Houston, TX 77002
Attn: Will Brown
      Eric McCord
      Vickie Booth
Email: <u>WillW_Brown@kindermorgan.com</u>
       <u>Vickie_Booth@kindermorgan.com</u>
       <u>Eric_McCord@kindermorgan.com</u>
       <u>ManualInvoices@kindermorgan.com</u>

**3.**     <u>**Availability of Information**</u>

In connection with FTI's activities on the Client's behalf, the Client agrees (i) to furnish FTI with all information and data concerning the business and operations of the Client which FTI reasonably requests, and (ii) to provide FTI with reasonable access to the Client's officers, directors, partners, employees, retained consultants, independent accountants, and legal counsel. FTI shall not be responsible for the truth or accuracy of materials and information received by FTI under this agreement.

### 4. **Notices**

Notices under this Agreement to the Client shall be provided as set forth in paragraph 2(e).

Notices to FTI shall be to:

FTI Consulting
1301 McKinney, Suite 3500
Attn: David Rush
Phone: (832) 667-5160
Email: David.Rush@fticonsulting.com

Notices shall be provided by (a) email, (b) hand delivery, or (c) overnight delivery. If provided by email or hand delivery, they shall be deemed effective the date given. If provided by overnight delivery, they shall be deemed effective on the date of actual receipt.

### 5. **Miscellaneous**

This Agreement: represents the entire understanding of the parties hereto and supersedes any and all other prior agreements among the parties regarding the subject matter hereof; shall be binding upon and inure to the benefit of the parties and their respective heirs, representatives, successors and assigns; may be executed by facsimile (followed by originals sent via regular mail), and in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; and may not be waived, modified or amended unless in writing and signed by a representative of the Client and FTI. The provisions of this Agreement shall be severable. No failure to delay in exercising any right, power or privilege related hereto, or any single or partial exercise thereof, shall operate as a waiver thereof.

Based on our understanding of the parties involved in this matter, we have compiled a list of interested parties (the "Potentially Interested Parties") and have undertaken a limited review of our records to determine FTI's professional relationships with the Company and such Potentially Interested Parties. From the results of such review, we are not aware of any conflicts of interest or relationships that we believe would preclude us from performing the Services.

As you know, however, we are a large consulting firm with numerous offices throughout the world. We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties. The FTI professionals providing services hereunder will not accept an engagement that directly conflicts with this Engagement without your prior written consent.

If this letter correctly sets forth our understanding, please so acknowledge by signing below and returning a signed copy of this letter to us.

Very truly yours,

FTI CONSULTING, INC.

By: _____
Name: David Rush
Title: Senior Managing Director

ACCEPTED AND AGREED this 16TH day of April 2022.

On behalf of Ruby Pipeline, L.L.C.

By: _____
    Name: Will Brown
    Title: Vice President, Commercial

Date: April 16, 2022

EXHIBIT A

FTI CONSULTING, INC.

STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with Ruby Pipeline, L.L.C. dated as of April 1, 2022 (the "Engagement Letter"). The Engagement Letter and these Standard Terms and Conditions annexed thereto (collectively, the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

1.  **Reports and Advice**

1.1  **Use and purpose of advice and reports**— Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party, or refer to us or the Services, without our prior written consent, which shall be conditioned on the execution of a third party release letter in the form provided by FTI. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

2.  **Information and Assistance**

2.1  **Provision of information and assistance** – Our performance of the Services is dependent upon you and the Company providing us with such information and assistance as we may reasonably require from time to time.

2.2  **Punctual and accurate information** – You and Company personnel shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. You and the Company shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.3  **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4  **Prospective financial information** – In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

3. **Additional Services**

3.1 **Responsibility for other parties**— You and the Company shall be solely responsible for the work and fees of any other party engaged by you or the Company to provide services in connection with the Engagement regardless of whether such party was introduced to you by us.  Except as provided in this Engagement Contract (including section 2 of the Engagement Letter with respect to the retention of certain agents and independent contractors), we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.  Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you or the Company, other than our agents or independent contractors engaged to provide Services, without your or the Company's written authorization.

4. **Confidentiality**

4.1 **Restrictions on confidential information**— All parties to this Engagement Contract agree that any confidential information received from the other parties shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, no party will disclose other contracting party's confidential information to any third party without such party's consent. Confidential information shall not include information that:

    4.1.1    is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

    4.1.2    is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

    4.1.3    is or has been independently developed by the recipient (without the use of confidential information).

4.2 **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, all parties will be entitled to disclose confidential information to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other parties.

4.3 **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4 **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews; *provided*, that we shall cause such persons to keep such information confidential in accordance with the terms of this Engagement Contract.

4.5 **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies; *provided*, that we shall keep such materials confidential in accordance with the terms of this Engagement Contract.

5. **Termination**

5.1 **Termination of Engagement with notice**— Termination of Engagement with notice –This Agreement is terminable by the Client or by FTI at any time upon the giving of thirty (30) days written notice. Upon such termination by the Client (the "Termination Date"), FTI shall cease work and the Client shall have no further obligation for fees and expenses of FTI arising or incurred after the Termination Date, provided, however, in the event of a bankruptcy, notwithstanding any termination by the Client or by FTI in the circumstances described in paragraph (a) under "Additional Provisions Regarding Fees" in the Engagement

8

        Letter, the Client shall reimburse FTI for its out-of-pocket expenses (the "Termination Expenses") incurred in connection with commitments made by FTI prior to the Termination Date with respect to advance travel arrangements reasonably incurred, to the extent FTI is unable to obtain refunds of such expenses. FTI shall provide the Client with reasonable documentation to substantiate all Termination Expenses for which payment is requested.

5.2    **Continuation of terms**— The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

**6.**    **Indemnification, Insurance and Liability Limitation**

6.1    **Indemnification** – Subject to any limitation post-petition required by the Bankruptcy Court, the Client agrees to indemnify and hold harmless FTI and its shareholders, directors, officers, managers, employees, contractors, agents and controlling persons (each, an "Indemnified Party") from and against any losses, claims, damages or expenses, or if same was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, or any hearing, inquiry or investigation, in each case by reason of (or arising in part out of) any event or occurrence related to this agreement or any predecessor agreement for services or the fact that any Indemnified Party is or was an agent, officer director, employee or fiduciary of the Client, or by reason of any action or inaction on the part of any Indemnified Party while serving in such capacity (an "Indemnifiable Event") against expenses (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any Indemnifiable Event. The Indemnified Party shall promptly forward to the Client all written notifications and other matter communications regarding any claim that could trigger the Client's indemnification obligations under this Section 6. If the Client so elects or is requested by an Indemnified Party, the Client will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the reasonable fees and disbursements of such counsel. In the event, however, such Indemnified Party is advised by counsel that having common counsel would present such counsel with a conflict of interest or if the defendants in, or targets of, any such action or proceeding include both an Indemnified Party and the Client, and such Indemnified Party is advised by counsel that there may be legal defenses available to it or other Indemnified Parties that are different from or in addition to those available to the Client, or if the Client fails to assume the defense of the action or proceeding or to employ counsel reasonably satisfactory to such Indemnified Party, in either case in a timely manner, then such Indemnified Party may employ separate counsel to represent or defend it in any such action or proceeding and the Client will pay the reasonable fees and disbursements of such counsel; provided, however, that the Client will not be required to pay the fees and disbursements of more than one separate counsel (in addition to local counsel) for an Indemnified Party in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which the Client assumes, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense. The Client further agrees that the Client will not, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the Indemnified Party or any other Indemnified Party is an actual or potential party to such claim, action, suit or proceeding) unless (i) to the extent that such settlement, compromise or consent purports directly or indirectly to cover the Indemnified Party or any other Indemnified Party, such settlement, compromise or consent includes an unconditional release of the Indemnified Party and each other Indemnified Party from all liability arising out of such claim, action, suit or proceeding, or (ii) to the extent that such settlement, compromise or consent does not purport directly or indirectly to cover the Indemnified Party or any other Indemnified Party, the Client has given the Indemnified Party reasonable prior written notice thereof and used all reasonable efforts, after consultation with the Indemnified Party, to obtain an unconditional release of the other Indemnified Parties hereunder from all liability arising from all liability arising out of such claim, action, suit or proceeding. The Indemnified Party shall not enter into any closing agreement or final settlement that could trigger the

Client's indemnification obligations under this Section 6 without the written consent of the Client, which shall not unreasonably be withheld or delayed or conditioned. The Client will not be liable for any settlement of any action, claim, suit or proceeding affected without the Client's prior written consent, which consent shall not be unreasonably withheld or delayed or conditioned, but if settled with the consent of the Client or if there be a final judgment for the plaintiff, the Client agrees to indemnify and hold harmless the Indemnified Party from and against any loss or liability by reason of such settlement or judgment, as the case may be.

This indemnity shall not apply to any portion of any such losses, claims, damages, liabilities and expenses to the extent it is found in a final judgment by a court of competent jurisdiction to have resulted primarily from the bad faith, gross negligence, willful misconduct or violation of law of any Indemnified Party.

6.2 **Insurance** –In addition to the above indemnification provision, FTI employees serving as directors or officers of the Company or its affiliates will receive the benefit of the most favorable indemnification and advancement provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.  The Company shall specifically include and cover employees and agents serving as directors and officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees.  Prior to FTI accepting any director or officer position, the Company shall, at the request of FTI, provide FTI a copy of its current D&O policy, a certificate of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other document that FTI may reasonably request evidencing the appointment and coverage of the indemnitees.  The Company shall maintain such D&O insurance for the period through which claims can be made against such persons.  In the event the Company is unable to include FTI employees and agents under the Company's policy or does not have first dollar coverage acceptable to FTI in effect for at least $10 million, FTI may, subject to the prior written consent of the Company, attempt to purchase a separate D&O insurance policy that will cover the FTI employees and agents only.  The cost of the policy shall be invoiced to the Company as an out-of-pocket expense.  Notwithstanding anything to the contrary, the Company's indemnification obligations in this Section 6 shall be primary to (and without allocation against) any similar indemnification and advancement obligations of FTI, its affiliates and insurers to the indemnitees (which shall be secondary), and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by FTI or otherwise).

6.3 **Limitation of liability** – You and the Company agree that no Indemnified Party shall have any liability as a result of your retention of FTI, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the bad faith, gross negligence, willful misconduct or violation of law of an Indemnified Party.  Without limiting the generality of the foregoing, in no event shall any Indemnified Party be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

7. **Governing Law, Jurisdiction, WAIVER OF JURY TRIAL, and Compliance with Law**

7.1 **Governing Law** – The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to the choice of law provisions thereof.

7.2 **Jurisdiction** – The Bankruptcy Court having jurisdiction over the Client's Chapter 11 Case shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. The parties submit to the jurisdiction of the Bankruptcy Court and irrevocably waive any right they may have to object to any action being brought in the Bankruptcy Court, to claim that the action has been brought in an inconvenient forum or to claim that the Bankruptcy Court does not have jurisdiction.

7.3 **WAIVER OF JURY TRIAL** – TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

7.4 **Compliance with Laws** - The Company agrees that it will comply with all anti-corruption, anti-money laundering, anti-bribery and other economic sanctions laws and regulations of the United States, United Kingdom, European Union and United Nations (collectively, the "ABC/AML/Sanction Laws") in connection with this Engagement. The Company further agrees that it shall not, and it shall procure its employees not to, pay or cause other person(s) to pay FTI using any funds that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI, or otherwise take any action that would result in a violation of any of the ABC/AML/Sanction Laws by either Company or FTI. The Company shall promptly notify FTI in the event of any violation or failure to comply with ABC/AML/Sanction Laws in connection with this Engagement, or allegations relating thereto, by the Company or its directors, officers, employees or agents.

FTI CONSULTING, INC.

**Confirmation of Standard Terms and Conditions**

Subject to the terms and conditions of the Engagement Letter, we agree that FTI Consulting, Inc. is engaged upon the terms set forth in these Standard Terms and Conditions as outlined above.

**On behalf of Ruby Pipeline, L.L.C.**

By: _____
    Name: Will Brown
    Title: Vice President, Commercial

Date: April 16, 2022